Wheaton College v. Burwell, Mr. Rienzi. Good morning and may it please the court. Three factors distinguish this case from Notre Dame. Different hiring policy. You know, I'm very surprised by the fact that I don't think you're, I don't think you're, I don't think your appellate record contains your, your community covenant. Certainly the record in the trial court did and I believe the joint appendix did as well, although I can't say that for certain. Okay, you're right. It's not in the joint appendix. It is in the record below. It's an exhibit to the Riken Declaration. And of course it's online. So I read it online and I was surprised to see there's nothing about contraception in it. Well, there's an express statement about respecting and protecting human life from the moment of conception until natural death. So I agree with you. There is no express reference to contraception in that document. That's true. But the reason it matters, Your Honor, is that the government has said that their reason for exempting tens of thousands of other organizations is that they hire people of their own faith. And the point is that Wheaton College hires people of its own faith. Given that, why do you have to fuss with the insurance companies? Your students and staff and all these people, they're not allowed to use these morning after pills or IUDs. Why isn't the prohibition adequate? So it's not adequate. If you're correct that these are all your co-religionists, none of them will ever order these things. Well, certainly that might be true, Your Honor, but Wheaton wants to live up to the religious beliefs. Well, I don't understand you. Why wouldn't a prohibition do that? In other words, Wheaton doesn't want to include it in the plan. Look, why don't you just prohibit? In fact, I think you do prohibit in your community covenant, which is supposed to be binding. They're prohibited from abortion. They're not allowed to do abortions, which you consider these morning after pills to be forms of abortion. So why isn't the prohibition adequate? So from Wheaton's moral perspective, Wheaton believes it has an obligation not to dangle the incentive. You are not answering my question. Have you had cases in which students or staff or so on used these things?  I'm not aware of any, Your Honor. Not to my knowledge, Your Honor. But Wheaton's religious belief is that Wheaton cannot include it in the policy, even if it's there. I don't understand. If nobody orders these things, what difference does it make? What's the issue? Wheaton does not want to include in its plans things that violate Wheaton's religious beliefs. But it's not in this plan if everybody's prohibited. It is in its plan according to the government. The government is saying it wants to change the plan administrator to put it in Wheaton's plan. If you take the premise that no one's ever going to use it, it's pretty hard to understand the government's reason for being here. It's your premise. No one's ever going to use it. It's my premise that this is co-religionists and that the federal government has said in the Federal Register that in a situation where an employer hires co-religionists, they have no interest in their mandate. It is arbitrary in the extreme for them to wish to enforce that mandate and force terms in Wheaton's policies where they have said they have no interest in regulating the policies of people who hire co-religionists. Wheaton has said that Wheaton has a religious objection uncontested by the government to putting that in its plans. So the government may argue, well, you shouldn't object because no one's going to use it, but the undisputed fact is that Wheaton does object. You can see the problem that if you just hire your co-religionists and so on and they obey your community covenant, you don't have anybody using these rules. And then you're talking about dangling the option in front of people. So not only do you want them to sign the covenant, but should they change and want to have such an option, you want to preclude that as well. Am I understanding that? Yes. Wheaton does not want to put it in its plan. Wheaton has no objection to all the other ways the government might offer people emergency contraception. Wheaton just objects to it being in Wheaton's plan. In order for the government to take over this and offer everybody these pills, they would have to know the names of all your staff and faculty and students, wouldn't they? Well, maybe, but not necessarily. How would they communicate with these people? They do right now, actually, allow people to come on the exchanges. The exchanges allow people to self-report things like their income. So your suggestion is that the exchanges offer a contraceptive-only policy? No. My suggestion is that the policies that are currently available on the exchanges right now have everything that the government thinks they ought to have. And any Wheaton employee or student who doesn't like what Wheaton offers is free to go get it from the government over there. The government's only answer to that is to say, well, there are burdens to signing up for health insurance. Well, you have to sign up for the Wheaton plan, too. Would you be willing to send the names of your students, faculty, and staff to the Federal Contraception Agency? No, I don't think Wheaton would be willing to do that, Your Honor. Wheaton does not want to help with the government's project of distributing these drugs. Mr. Renzi, let me go back, if I could, a little bit. Obviously, these issues were presented about a year ago to this Court and then to the Supreme Court. Yes. As I understand it, no member of the Supreme Court voted for the relief that you are seeking now. Is that correct? I guess I wouldn't say that. I think the relief we're seeking now is different because the rules changed after that to accommodate the order in this case, right? Well, that's what the government claims. I don't think that's true, but that's what the government says. But that's, in essence, let's call it the two-stamp solution, right? Yes, except we don't agree that it's the same as the order. What's the difference? Several differences, Your Honor. What the Supreme Court ordered was a Baird notification, which is what the Little Sisters of the Poor had done, and what Wheaton had previously done. Wheaton has no objection to saying where Wheaton College, we object to this stuff. We've always said that. What the new rule requires is reporting details about your plan along the lines that Judge Posner was describing. You have to report who's the plan administrator. You have to give them the contact information so that they can call the plan administrator and make the plan administrator do things on your plan that you don't want them to do. That was going to happen anyway, right? It's not a top secret who your insurer is, is it? Well, it's not, but Wheaton objects to being involved in that manner. And the point is that the government requires this intervention. What are the other differences? It is that you have to give this notice, that the government says this notice is an instrument under which your plan is operated. That's on page JA-25. They say a notice to the secretary is an instrument. Wheaton does not want to create instruments under its plan that help this process go forward. You have to give the TPA's name and contact information and information about your plan, and you have an obligation to continually update so that if Wheaton changes its TPA next month, Wheaton has an obligation to go back to them. Our answers are twofold. One, Your Honor, that shows it's our plan, right? To the extent in the Notre Dame case you thought it's not your plan. But I think you overstated when you say that the requirement of notice and so on requires the insurers to cover these things. It does, Your Honor. No, it's the government that forces them. With all due respect, Your Honor, it is not. And I can demonstrate to you why it's not. Of course, it's the Affordable Care Act. That's government coercion of these insurers. It is government coercion, Your Honor, but it only happens if Wheaton either A, puts it in its plan, which it has not done, or B, gives the notices. So you can look at this case in Notre Dame. Do you think it's illegal for the government, without any notification by you, just to tell these insurers that they have to make these contraceptives available? It is certainly illegal. It is illegal if what they are purporting to do is make them a plan administrator of our plan. Do I think in the abstract the government could order Blue Cross to give out drugs? I don't want the abstract. Just answer my question. Can the government tell the insurers, with no contact with Wheaton or anything, can it just tell the insurers, you have to provide? I mean, you say universal coverage would be fine. Yes, so universal coverage would be fine. So all you care about is having to notify, right? We care about the use of our plan. But notification is not force. Well, it is in that the obligation doesn't arise unless we notify in that way. So the drugs are not flowing right now in connection with Wheaton's plan. They were flowing in connection with Notre Dame's plan. What's the difference? Notre Dame signed the form and designated them as a plan administrator. So is it correct, then, Mr. Renzi, that Wheaton is currently in violation of the law? I don't think we are. We have an injunction from the Supreme Court that lets us do what we're doing. The government has no authority to make them a plan administrator without us. So you've complied with the order? We complied with the order long before the order was written, Your Honor. We told them we object. That's all we had to do. So Wheaton's not in violation now. Do your students and employees have this coverage available to them if they wish? Not through Wheaton's plans. They don't. They could go to the exchanges and get it. The government could provide it in any other way. But through Wheaton's plans, they do not. Well, can you say the government can provide in any way? Can it simply order the insurers to provide coverage? If it is separate from our plan. In other words, if they're not making them a plan administrator from our plan. I'm just saying, forget your plan. Suppose the government just says to all the insurers in the country, all the health insurers, you have to provide these contraceptives, period. Now, would that violate your religious rights? That sounds to me like the universal coverage that you said. And no, if they're simply having a separate, we don't object to them doing things with Blue Cross. We object to them doing things on our plan. And so that's why, and I apologize for interrupting, Your Honor, but that's why I said the plan matters. The plan matters to Wheaton. We have a plan. We don't want the government to use it in this way. If they don't say anything about the plan, but just tell the insurers, you have to cover this stuff. That's fine. If it's you have to cover this stuff, period, I agree with you. It's fine. If it's you have to cover this stuff in Wheaton's plan, it's not fine. That's what Wheaton's religious objection is. I don't think the government has any interest in whether it's Wheaton's plan or... hired by the insurance company or some other entity as long as it's not Wheaton. As long as it is not Wheaton's plan. So the current system is not what you described, Your Honor. The current system says they're going to change Wheaton's contract and make them a plan administrator of Wheaton's plan. We object to that. If separately they have a contract with Blue Cross Blue Shield where Blue Cross Blue Shield is giving out the stuff every day, that does not implicate Wheaton and its plan, and we are not objecting to that. So who would be the TPA under that scenario if Blue Cross was? The TPA would be designated by the government or through Blue Cross or something like that. Again, you say the word designate and I worry because that's the word that the government uses saying they will designate them as the plan administrator on Wheaton's plan. We object to that. It sounds like this is all an ERISA issue. It's a lot an ERISA issue and frankly they don't have anything close to ERISA authority for what they're doing. One of my questions, the ERISA issues seem to be fairly new here. I'm wondering what irreparable harm you see under ERISA, under the ERISA theory. The irreparable harm is that we have a religious objection to these things being in our plans. I'm talking about the ERISA. So the irreparable harm from their ERISA violation is to our religious liberty or First Amendment rights. I think that's how we're harmed. But again, if I could just take one step back on the ERISA arguments and on the takeover of the plan, what's surpassingly odd about this is not just that the government has no particular interest in using Wheaton's plans to do this, or they shouldn't have a particular interest in using Wheaton's plans. They shouldn't. But also, this is discriminatory within Wheaton in that hundreds of Wheaton employees are on a grandfathered PPO that doesn't have to provide this stuff at all. And so the government's position is they've got a compelling government interest in what? Some of the people who work at Wheaton College. And as to the students, it's the same thing. Something like 20 percent of the students are on the student plan. Well, 80 percent of them are not. And the government's claiming a compelling government interest in some fraction of the students at Wheaton College. That's not a compelling government interest. It's not even close. So ultimately, the government could do this without us. The easiest way, and the one that was not addressed by this court in Notre Dame, is those exchanges. Those exchanges are good enough for millions of people, according to the government. The government boasts about how good it is to go get choices on the exchanges. So if the government thinks people need this stuff, the government's allowed to sell them policies on the exchanges. And today, any Wheaton College employee who doesn't like what Wheaton offers— This may go down the drain, right, the King versus Burwell? Well, it may go down the drain, Your Honor, but the bottom line is Congress thought those exchanges were good enough. You don't have any science in your appellate record. You talk about traditional contraception, and I suppose you mean by that that it doesn't kill a fertilized ova, right? Stuff like the pill, for example, the traditional pill. Now, what makes you think that the morning-after pill destroys a fertilized ova? I see my light is on. The FDA birth control guide says that—there's no dispute between the parties as to how the drugs work. The FDA birth control guide says that it may interfere with implantation of an embryo, and that's the effect that Wheaton College objected to. This is not the scientific consensus. It's true of IUDs, but what I read is that the morning-after pill, what it does, it'll prevent ovulation. If ovulation has occurred, it'll prevent the sperm and the ovum from uniting. But it's not at all clear that it'll, for example, prevent a fertilized ovum from attaching itself to the wall of the uterus. So, I'm not sure you're on solid ground in regarding these morning-after pills as abortifacients, but I notice there's nothing in the briefs about this. I would respectfully disagree. I agree. You're right. There's nothing on the science in the briefs. I would simply say the issue is not contested by the government, and ultimately it's Wheaton's moral decision. Wait a second. You say you don't object to traditional contraception because it doesn't kill a fertilized ovum. Now, if it turns out these morning-after pills don't kill fertilized ova either, then your objection to them would disappear. I think Wheaton would have to do some moral consideration of the evidence that Your Honor is talking about. No, no. It's scientific. You have adopted, you have accepted traditional contraception. You say that's fine. That's not against your religious views. Well, if it turns out that the morning-after pills are no different in consequence from the morning-before pills, then I don't see what your problem is. I would say that at some point Wheaton could theoretically change its beliefs on that if it believed that evidence, but it does not. I don't understand. This is a scientific, not a religious question. No, it's not religious. I mean, you wouldn't, I'm sure, take a position that science had rejected. I don't think Wheaton would be likely to take such a position, and I don't think they've taken one here, Your Honor. I have just another brief question. Sorry to take all your time like this. What if a student is raped? Is there any exception for that? I'm not aware of a specific policy on it either way, Your Honor. I assume Wheaton's position would be that rape is a horrible thing, but that it wouldn't justify the... I'd be guessing, Your Honor. Thank you, Your Honor. Mr. Jett? Good morning, Your Honors. May it please the Court. It appears to us that most of, or really all of the arguments that the plaintiffs are making here were addressed in the Notre Dame decision. Obviously, we're aware of the fact that the Notre Dame decision said that it was tentative and suggested that perhaps there would be further factual development that could occur in district court. I do just want to flag something for the Court, of which you may not be aware in this case, which is that in this case, Wheaton College had actually already moved for summary judgment in district court with respect to the six counts that are at issue on this appeal, and Wheaton College in its motion made clear, I think you can find this at docket number 41, made clear that with respect to the counts that are at issue in this appeal, they have some other counts that they didn't assert in their motion for a preliminary injunction, but with respect to the counts that are at issue in this appeal, that they believe the record was complete, there was no need for further discovery, and I apologize, it's actually docket number 43, not docket number 41. And then, in fact, in their request for discovery with respect to those other counts, they again made clear that they just wanted discovery with respect to those counts and not with respect to these counts. So just to the extent that the Court may have had in mind a need for discovery or further factual development with respect to the arguments that Notre Dame was raising, here Wheaton College has made clear that with respect to the arguments that are at issue in this appeal, that is not necessary. Sometimes district judges disagree as to whether the record has been sufficiently developed, right? That may be, you know, I don't know whether the district judge opined on that or not. I just wanted to flag that for the Court's consideration since it appeared that in Notre Dame, the plaintiffs, I mean, essentially had not met their burden to get a preliminary injunction, but maybe were suggesting that there were more facts they wanted to develop, whereas here, the plaintiffs have actually already said that there are no additional facts that they wanted to develop. When the counsels are trying to distinguish Notre Dame, talking about the method in which the employees were hired, those differences, do you view those differences as significant or minor in terms of the applicability of that case? We do not view it as significant. And why not? Well, I guess there are a couple of responses. First, just sort of a set of legal responses. I mean, when the Supreme Court, well, sorry, first I should just step back and say, I understand my friend's argument about the kind of religious views of the employees and students at Wheaton College, only to concern the compelling interest argument and not to concern the substantial burden argument. So our understanding from Notre Dame is the Court held that there is not a substantial burden under RFRA, and therefore the compelling interest test does not apply. My friend is a little bit unclear at times, but I understand his compelling, his argument about co-religion of students and employees essentially to be that if he's right about substantial burden, and it seems like the Court rejected that argument in Notre Dame, but that if he is right about substantial burden, I think his suggestion is that there would not be a compelling interest in ensuring that the thousands of employees and students at Wheaton College have easy access to contraception. And with respect to that argument, there are a couple of responses. First, just as a legal matter, when the Supreme Court has discussed compelling interest in the past, they have ordinarily referred to the nature of the exemption and not the actual specific plaintiff. So if you look at something like Yoder, it refers to the Amish exemption, even though there were only, I think it was three families at issue in Yoder. You see the same thing in Sherbert and in Thomas and in Lee. And then even after RFRA gets passed, if you look at Ocentro, which was a Supreme Court RFRA case, it then refers back to Yoder and to Sherbert in those terms. But you actually don't even need to deal with that because we make an argument in our brief where we point out, look, if the plaintiffs were right, it would mean that to have this case at all, for the government to be able to show that there's a compelling interest, there would need to be discovery of thousands of students and employees about the most personal things you could imagine. Their sexual activities, their health history, their religious views. And it's interesting, if you look on, I believe it's page 16 of plaintiff's reply brief in a footnote, they say that they agree that that kind of discovery would be completely inappropriate. And then they just say, therefore, it means that every organization, or at least religious organization, I think he's a little bit unclear what he's talking about there, just should be automatically exempt and treated like churches. And if that's the case, I mean, one, he's just essentially saying it doesn't matter whether there's a compelling interest with respect to the women who work for the school or are employees of the school. But two, I mean, it essentially just rejects what we think the Supreme Court made clear in Hobby Lobby and again made clear in its order in this case, which is that at the end of the day, it's important that the women get the coverage. But Judge Williams, there's actually also just a factual response to your question, as I think Judge Posner's question indicated. The plaintiffs make this kind of assertion about the religious views in the covenant that their employees and their students have taken. But if you go and you actually look at those documents, it does, it's just sort of a general reference to, I think, the sanctity of life. It doesn't say anything specific with respect to contraception. Certainly nothing like, you know, a woman would not use contraception under any circumstances, even if there were, you know, a health need or something like rape or anything else. And Judge Posner, there's actually an additional factual problem with their argument as well, which is that they try to avoid this in the briefs a little bit, but I think their complaint actually makes this clear. Their plans don't just cover students and they don't just cover employees, but they also cover dependents. And even to the extent that they're saying that their employees and their students have agreed to some covenant, which I guess Wheaton suggests would mean that they would never use contraception, they certainly don't try to represent the views of people who are married to their employees or the children of their employees who are also covered under this plan. So Judge Williams, I mean, I don't see why it is that that would distinguish this from Notre Dame in any sense. It seems like really my friend seems to kind of keep going back and forth on exactly what it is, what religious objection it is that they're making. In response to some of Judge Posner's questions, it seems like my friend was at least willing to agree, sort of setting aside the metaphysics of ERISA, that if just every third party administrator and insurer were required to provide contraceptive coverage, that that would be OK with him. I just want to point out to the extent that he's even willing to make that narrow concession, then at least one thread of argument in their briefs, the argument that says that they don't want to have any kind of contractual relationship with a company that does something that they object to, seems to go out the window. To the extent that Mr. Rianzi then just keeps falling back on the form, he keeps talking about a trigger and says, well, you know, it's only because the government notified his insurer and third party administrator, it's only because the government contacted Blue Cross, that now Blue Cross is providing coverage to the employees and the students at Wheaton College. Then it really is just an objection to the act of opting out, which I mean, I'm happy to discuss it, but that's not an issue in this case, because the act of opting out has already occurred. And to the extent that Mr. Rianzi's argument seems to maybe try to hone in on some of these metaphysics of ERISA, again, I think there's a little bit of a contradiction in his argument, because I mean, his kind of metaphysical ERISA argument at most would only apply to the self-insured plans and not to the insured plans, because insured plans aren't covered by that same ERISA authority. Instead, it's subject to an HHS statute. And I don't understand Mr. Rianzi to be saying that he no longer has any objection with respect to the fully insured plans. And of course, I should actually point out that if he were OK with the insured setup and the only problem was the sort of operation of ERISA, of course, then Wheaton College could just insure rather than self-insure some of their plans. That would be an alternative that's available to them. And I mean, I think as this court made clear in both Notre Dame decisions, but I think the second Notre Dame decision spelled this out quite clearly, I mean, just realistically look at what's going on. I mean, the coverage is entirely separate. There's no payment, direct or indirect. Blue Cross, not Wheaton College, will send a notice to the students, the employees, and the dependents. That notice will say, your employer is not providing this coverage. Instead, we are providing this coverage. So at the end of the day, I'm not exactly sure why all of those differences matter to him. But most importantly, I don't understand why they would pose a substantial burden under RFRA. Mr. Judd, you may think you've already covered this, but could you address the hypothetical that plaintiffs offered in their brief, suggesting this is as if the government orders that, for example, a hospital that has objections to this make its facilities available for others to perform surgical abortions in their facilities? Sure. I mean, I think there are a couple of responses to that. Obviously, as this court is aware, it's fairly easy to kind of generate hypotheticals that are different. We generate a lot. Right, of course, and that are different in a number of small ways and kind of push your intuition one way or the other. So obviously, there are very similar hypotheticals that perhaps intuitions would be a little bit different. Why don't you take a shot at that one? Sure. So I mean, I think with respect to their hypothetical, I mean, the whole point of this accommodation of this opt-out is, I guess, to kind of take the abortion out of the hospital. I mean, the Supreme Court in Hobby Lobby described these accommodations as making folks like Wheaton College effectively exempt, and I should actually point out the Supreme Court's order in this case, I think actually speaks to this, because remember that in this case, the government made the argument to the Supreme Court that they're making here and that I think this court referenced in Notre Dame, too, where the government said, look, the source of the obligation on Blue Cross is us. We, as the government, are putting a legal obligation on Blue Cross. This is coming from us. And then the Supreme Court in the Wheaton College order said, well, if Wheaton notifies the government, then the government can rely on that notification and ensure that women have access to all forms of contraceptive coverage. So I mean, it seems like the Supreme Court order itself addresses that. And I mean, Your Honor, you can just kind of turn the hypothetical on its head. You can kind of ask what if someone who were to perform abortion would rely on lab work that somebody had done in a hospital. So, I mean, obviously all these hypotheticals are a little bit different and push your intuition one way or the other. Okay. What's your understanding, Mr. Jed, of the current status of contraceptive coverage for Wheaton College employees and students? My understanding is that they are, I believe that they are receiving contraceptive coverage. What I know for sure is that the government has notified Blue Cross. And I don't remember if there's another company at issue. I believe the student plan may be covered by a different insurance issuer, but has notified the companies of their obligation. My assumption, though I do not have definitive facts on this, is that those companies are now complying with that requirement. What do you understand Wheaton to be seeking now? If, as you say, the government has notified these insurers, do they want that notification rescinded or what? You know, obviously I'll let Mr. Rienzi address that question. I mean, it seems like ultimately Wheaton's objection is an objection to these women receiving contraceptive coverage. So it seems like they want some kind of court order which will stop their students and their employees and the dependents of those students' employees from having access to contraceptive coverage. Through the plan. Sorry? Under the umbrella of their relationship with Wheaton. I suppose that's right. I mean, obviously the answer to that question turns a little bit. It is true that the insurer's obligation towards any individual ends when that individual is no longer covered under the Wheaton plans, right? Yes, that is correct. To the extent that, and, again, I think my friend kind of keeps moving back and forth between different arguments. To the extent that that is my friend's argument, I mean, just understand how novel and broad that would be. It would mean, for example, that if the government just provided a social benefit only to folks who had a job or maybe only to folks who had been recently laid off, he could say, well, it's only because we hired someone or it's only because we fired someone that they have access to that social benefit. And, I mean, kind of like they're saying that it's a substantial burden if we opt out because someone else will then replace us. That would sort of be a way of saying it's a substantial burden for the government to have any kind of social benefit where that social benefit is only offered if we've hired or fired someone. I mean, it's just a strikingly novel and broad conception of what could be a substantial burden under RFRA. And, in any case, I mean, we think five justices in the Supreme Court I think quite clearly spelled out that having this kind of easy access to contraceptive coverage is a compelling interest. Unless the court is interested in discussing the health care exchange alternative that my friend discussed or the... No. Okay. Thank you, Your Honor. Okay. Thank you very much. Thank you. Mr. Jed. Mr. Rienzi? Would you be content if the government ordered another insurance company, a company that doesn't have a contract with Wheaton to provide this coverage? So it's Judge Hamilton's point. If it's not on our plan, then we would not be raising a religious objection to it. So, for example, Title X exists, and maybe they've given stuff to Wheaton employees. I don't know, but we don't raise a religious objection to that. But what if the government said to these insurers, the existing insurers, Blue Cross, whatever they are, said we require this coverage, but we want to emphasize this is not part of your contract with Wheaton. It's not part of the plan. It's totally separate governmental obligation we're placing on these insurers. It's obviously much easier for them to place the burden on the insurers who are currently dealing with the students and staff and so on. Would that be objectionable? So if the government sets something up that's completely separate from our plan, then I don't think Wheaton is likely to raise any objection to that. Again, to be clear and to disagree with my friend, we are not saying we have a general objection to any way the government gets this stuff to people. We're objecting to the use of our plan. And just to be as clear as we can be, this came up in the Notre Dame case quite a bit, the government's trying to put something into our contract that is not currently in our contract, and all we're saying is, hey, that's my contract, and I have a religious objection to you putting stuff in it, and if the government insists that we provide a contract that comes with seamless access to these drugs, we can't do that. That's what our objection has been. So to go to your question, Judge Posner, about what's the relief that Wheaton wants, Wheaton would love to get an order from this court that tells the government, go do it one of a million other ways, but stop trying to take over Wheaton's plans, stop trying to add terms to the contracts, stop trying to name people plan administrators. So what should that say? It should be an order to the government that says the defendants are hereby prohibited from naming plan administrators on Wheaton's plans, adding terms or benefits to Wheaton's plans, writing plan documents for Wheaton's plans, which is what they claim to do. And if they truly are hands-off our plans, then Wheaton would be fine. But the problem is they haven't been hands-off our plans. We have a contract, which is a JA-96, saying that Blue Cross can't be the plan fiduciary on our plan. That's what we agreed to. The government wants to edit the contract and remove Wheaton as the plan administrator under ERISA, which Wheaton currently is, replace Wheaton with someone Wheaton doesn't want to be the plan administrator, and then make the contract crank out stuff Wheaton doesn't want to. We're involved at that point. Let me ask you another. I'm very puzzled by the fact that you say that, which I certainly accept, that Wheaton is not actually affiliated with any church. So Wheaton is a – sure. I mean, they are not affiliated with a church in that they are not a Southern Baptist school or a Roman Catholic school. They are certainly associated with the evangelical tradition. They're a nondenomination of evangelical. Not with another institution. Not with a particular church. And, again, if they went and stood closer to some church, same school, same employees, the government would say, okay, we don't have to regulate you at all. And the government should have no business nudging Wheaton closer to a church. Well, what I find surprising is that couldn't you incorporate as a religious corporation rather than as a nonprofit? I actually don't know the details of Wheaton's incorporation status, so I don't know whether they picked nonprofits or religious. I was just thinking, if you have an institution that is, in fact, a religious institution, and you know you have, what, thrice weekly compulsory chapels. Wheaton is a very religious place. So why can't an institution like that register as a religious body? I think the government wouldn't care. In other words, I think the government says the only thing that matters is your 6033 Internal Revenue Code tax status. But, of course, the churches, they don't have to get involved with any of this. They don't have to notify anybody, tell anybody anything. They're exempt with nothing. But are you saying Wheaton cannot seek the same status as a church, even though it strikes me as really a church? So functionally, I agree with you. There's no reason for the United States government to pick and choose among religious organizations in this way. I will just say Wheaton is, while deeply religious, I don't think has previously claimed itself to be a church. It has claimed itself to be a nonprofit religious ministry. But conceivably it could. If the government would allow it, theoretically it could. But the broader point I think you're getting at is that there's really no difference in a reason why the government ought to discriminate against Wheaton based on that. And if the government is willing to rely on its guesswork about how everybody else hires and give them exemptions, it's kind of arbitrary to say that they need to take Wheaton's plans in this context. So that's our view, Your Honor. Okay. Well, thank you very much, Mr. Yancy and Mr. Jed, and Mr. Quirk. Now, an announcement of the people in the room. There's another set of arguments scheduled for 930, but we're going to have to recess, discuss this case briefly. So probably the next set of case arguments will begin in another 10, maybe 15 minutes. Thank you.